Filed 1/6/15  P. v. See CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TONY SEE,<br><br>    Defendant and Appellant. | F066357<br><br>(Super. Ct. No. VCF253644)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Mark Farbman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Following a jury trial, defendant Tony See was convicted of the murder of Oscar Arzate (count 1) (Pen. Code, § 187, subd. (a)),[1] and convicted of the attempted murders of Christopher Nunez (count 2), Pedro Garcia (count 3), Joseph Nunez (count 4), Mariana Duenas (count 5), and Giselle L., a minor, (count 6) (§§ 187, subd. (a), 664).[2] Defendant was sentenced to life without parole plus 525 years to life as follows: for count 1, life without the possibility of parole plus three consecutive terms of 25 years to life for firearm enhancements under section 12022.53, subdivision (d);[3][4] for counts 2 through 6, defendant was sentenced to 15 years to life plus three consecutive terms of 25 years to life for firearm enhancements under section 12022.53, subdivision (d).[5] The trial court imposed, inter alia, a parole revocation fine.

On appeal, defendant raises five contentions. First, he argues his trial attorney rendered ineffective assistance when he failed to seek exclusion of defendant's pretrial

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] The abstract of judgment contains a scrivener's error, showing convictions under sections "667/187(a)." As discussed in part IV., *post*, we order the trial court to correct the abstract of judgment on our own motion. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186-187.)

[3] For count 1, the information alleged firearm enhancements under section 12022.53, subdivision (d), three times as to Arzate, Joseph Nunez, and Duenas. The verdict forms tracked the allegations set forth in the information. It is unclear why more than one firearm enhancement was alleged in count 1 under section 12022.53, subdivision (d).

[4] For count 1, the jury found true the special circumstance that defendant committed the offense as an active participant in a criminal street gang in violation of section 190.2, subdivision (a)(22). For counts 1 through 6, the jury also found true special allegations that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), personally used a firearm (§ 12022.53, subd. (b)), and committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)). At sentencing, the trial court stayed these enhancements. A detailed discussion of the jury's findings is set forth in part IV., *post*.

[5] For counts 2 through 6, the information alleged firearm enhancements under section 12022.53, subdivision (d), three times in each count as to Arzate, Joseph Nunez, and Duenas. The verdict forms tracked the allegations set forth in the information. It is unclear why more than one firearm enhancement was alleged in counts 2 through 6 under section 12022.53, subdivision (d).

statements to police, which defendant contends were inadmissible as the result of police coercion. Second, he maintains the trial court abused its discretion under Evidence Code section 780 and violated his right to confront and cross-examine witnesses against him when it excluded evidence of pending charges offered to impeach two key prosecution witnesses. We find these two arguments unpersuasive.

Third, defendant asserts the sentences imposed on all six counts constitute cruel and unusual punishment because, as a juvenile, he was sentenced to life without the possibility of parole (LWOP) on count 1 without consideration, inter alia, of the constraints imposed by the United States Supreme Court in *Miller v. Alabama* (2012) 567 U.S.__ [132 S.Ct. 2455] (*Miller*), and he was effectively sentenced to LWOP on the remaining counts in violation of, inter alia, *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). Respondent concedes the sentences on counts 2 through 6 constitute cruel and unusual punishment under *Caballero*, but argues the sentence on count 1 was not in error. We accept respondent's concession on counts 2 through 6 as proper in light of *Caballero* and find defendant's argument on count 1 persuasive because the trial court failed to articulate the juvenile sentencing factors set forth in *Miller* when sentencing defendant to LWOP. The matter is remanded for resentencing on all counts consistent with *Miller* and *Caballero*.

Fourth, defendant contends 12 firearm enhancements under section 12022.53, subdivision (d), must be stayed in accordance with section 12022.53, subdivision (f), and the abstract of judgment must be corrected. Respondent concedes this point, which we accept as proper. In addition, a clerical mistake incorrectly lists 12 additional stayed enhancements under section 12022.53, subdivision (d), which must be modified to reflect the 12 stayed enhancements the jury found true under section 12022.53, subdivisions (b) and (c), but which the court stayed.

Finally, defendant argues the parole revocation fine must be stricken. In light of the vacated sentences, we will not address this issue.

3.

We affirm the convictions but remand for resentencing. The new abstract of judgment shall reflect 12 stayed enhancements under section 12022.53, subdivision (d), and reflect the 12 stayed enhancements the jury found true under section 12022.53, subdivisions (b) and (c).

*FACTUAL BACKGROUND*

***The shooting***

At approximately 2:30 a.m. on June 8, 2011, Arzate, Joseph Nunez, Christopher Nunez, Garcia and Duenas were in the parking lot of an apartment complex at 325 Northeast 4th Street in Visalia. They were drinking and listening to music from one of the cars in the parking lot. Giselle L. came outside from the apartment complex to give Duenas a packet of noodles to eat.

Arzate and Joseph Nunez were members of the Norteño gang. Duenas was a Norteño associate. No one in the group had weapons with them.

Without anyone in the group hearing a prior warning, multiple gunshots were fired at them. Duenas was "pretty sure" more than one gun was fired and Christopher Nunez later informed police he heard more than one gun. None of the victims either saw a shooter or anyone fleeing the scene.

Duenas was hit by seven shotgun pellets: four in her stomach, one in her breast, one in her arm, and one in her head. Joseph Nunez was hit in his right arm, stomach and face. Giselle L. and Christopher Nunez were unharmed. Arzate was struck with a shot to his head, most likely from a solid slug fired from a shotgun, and he later died. Two birdshot pellets were recovered from inside the laceration on Arzate's head.

Officers from the Visalia Police Department located five expended shotgun shells on the ground by the apartments to the southwest of the victims.

4.

*Amos Robinson*[6]

Robinson lived at the corner of Northeast 4th and Grape in Visalia. During the early morning hours on June 8, 2011, Robinson, who worked graveyard shifts and was already awake, heard dogs barking, looked out the window of his residence, and saw a male with a thin build and long hair walking across the neighbor's lawn. The area was well lit from a streetlight at the corner, the neighbor's porch light, and Robinson's porch light. The male wore a large brown coat. A minute or two later, Robinson heard four or five gunshots. Robinson ran back to his window and saw the same male walking very fast or running back across the neighbor's yard going in the opposite direction carrying either a rifle or shotgun. After the male left his sight from the window, Robinson stepped outside his residence and peaked around the corner of his house to watch the male flee. The male appeared to run to the apartment complex across the street, where he disappeared between the buildings. Robinson called 911, continued to watch and saw the male peek out from between the buildings several times before he disappeared after approximately five minutes going southbound on Northeast 5th Street.

Later that same morning, Robinson informed a police officer the male was Hispanic. Robinson also said he would be unable to identify the male. A few days later, police had Robinson view a six-picture lineup and he identified defendant.[7] Defendant is Asian. When Robinson made the photographic identification, he was sure of his selection despite previously believing the male was Hispanic.

At trial, Robinson identified defendant as the male he saw holding the gun. He explained at trial some Hispanics look slightly Asian and vice versa, but he recognized

---

**6** In 2008, Robinson was convicted of a misdemeanor for annoying or molesting a child under the age of 18 years pursuant to section 647.6.

**7** Out of the six pictures Robinson viewed, only defendant's photograph showed a person with long hair, although one other photograph showed someone with a possible ponytail.

defendant's face as the male he saw on the night of the shooting despite the earlier racial mistake and he had no doubt he identified the correct person. Robinson did not remember telling the police officer on the morning of the shooting he could not identify the male and he did not know why he would have said that to the officer.

On cross-examination, Robinson admitted he had "[s]light" eye issues and wore corrective lenses, although he did not own eyeglasses on the night of the shooting because he could not afford them. He described his eye issues as "not severe at all. I can still recognize faces and words." Robinson did not wear his eyeglasses while he testified. He took three medications, which he stated did not affect his ability to comprehend.

### Richard Verdugo

On the night of the shooting, Verdugo was a member of the Oriental Troops, a rival gang of the Norteños.[8] Verdugo was friends with, and distantly related by marriage to, defendant. Verdugo knew defendant to be a member of the Oriental Troops.[9] Verdugo is half Hispanic and half Asian, but he looks more Hispanic. Verdugo generally wore his hair very short and never shoulder length.

Verdugo was staying at a residence owned by his "stepgrandmother" at 112 Northeast 5th Street in Visalia. On the day leading up to the shooting, defendant spent time with Verdugo at that residence. They smoked marijuana and cigarettes, and then went to a friend's house and drank five or six beers within 45 minutes of arriving.[10]

---

[8] At the time of trial, Verdugo had stopped his affiliation with the Oriental Troops gang because of his testimony against defendant.

[9] Police officers believed defendant was a member of the Lahu Pride Crip gang, a subordinate group of the Oriental Troops, one of the Asian gangs in Visalia. Oriental Troops is a street gang primarily located in the area where the Arzate shooting occurred. In Visalia, the Norteños predominate. Oriental Troops are the enemy of the Norteños in Visalia. An Oriental Troop member could gain respect by shooting at Norteños.

[10] At trial, Verdugo admitted lying at the preliminary hearing when he denied he smoked marijuana during the day of the incident.

They started drinking around 10:00 p.m. that night and, according to Verdugo, defendant appeared "stoned" and drunk. After a few hours, Verdugo and defendant returned to the residence on Northeast 5th Street.

Defendant had a .38-special handgun, which he showed to Verdugo. Later in the evening, defendant made a phone call to an unidentified source and asked for another weapon. Approximately 10 to 20 minutes later, someone drove to the front of the residence and delivered a Mossberg shotgun to defendant, who received it out in the street. Defendant loaded the shotgun. Defendant told Verdugo he was going to "hurt" a "Norteño."

Verdugo went inside briefly and when he came back outside, defendant was walking down the street holding the shotgun in his left arm and the .38 in his right hand. Verdugo caught up to defendant, told him "it wasn't worth it" and to return home, but defendant said, "no." Verdugo offered to come along and help him, but defendant pointed the handgun at Verdugo and told him to go back home.[11] Verdugo thought defendant was acting under the influence of alcohol.

Verdugo initially walked away but stopped and hid on the corner of Grape and Northeast 4th to watch defendant, who walked towards an apartment complex on Northeast 4th Street. Verdugo followed defendant but at a distance. Defendant jumped over a fence and into the parking lot of the apartment complex on Northeast 4th.[12] It was known that rival gang members lived in that area and Verdugo knew the people "hanging out" in the parking lot were Norteños.

---

[11]    At the preliminary hearing, Verdugo testified defendant never threatened him.

[12]    At the preliminary hearing, Verdugo testified he saw someone jump with defendant over the fence on Northeast 4th Street.

7.

Defendant went to the side of a car after he jumped over the fence. Verdugo was about 50 to 85 yards away and heard defendant shout, "What's up, Ene?"[13] Verdugo saw defendant shoot at four people who were in the parking lot. Verdugo ran back to his residence after he saw defendant fire three times, but he heard a total of five or six shots.

After Verdugo returned to his residence, defendant arrived still holding the shotgun. Defendant said, "I think I got 'em." Defendant tried to give the shotgun to Verdugo to hide, but Verdugo refused to take it. Defendant hid the gun someplace without Verdugo's knowledge.

Later that night, defendant told Verdugo he received the shotgun from a man named Elijah. The next day, Verdugo saw defendant hand the shotgun back to someone through the window of the same car that delivered it the night before.

A month prior to trial, police paid Verdugo $300 to obtain information about the Oriental Troops as part of a "debrief" once he left that gang. On cross-examination, Verdugo admitted he had fired guns at people and had broken into vehicles for the gang to earn respect.

### Police investigation

On June 10, 2011, police searched the residence of Elijah Saesee at 1104 North Mooney, located one mile from where Verdugo was staying at his stepgrandmother's residence, and located a 12-gauge Mossberg shotgun. Saesee knew defendant from when he lived in Farmersville from 2002 until 2004. Saesee testified he had no involvement in the shooting but a man named Michael, whom he did not know but was afraid of, brought the shotgun to Saesee's garage, left it there and said he would pick it up later. Police conducted tests on the 12-gauge Mossberg shotgun. Three of the shells located at the

---

[13] "Ene" refers to "Norteños." At the preliminary hearing, Verdugo testified he was too far away to hear whether anything was said prior to the shooting and he admitted at trial he lied at the preliminary hearing about this.

crime scene were fired from the same Mossberg but the other two shells were inconclusive.

Defendant was arrested on June 10, 2011, after Robinson identified him. Police interviewed defendant twice that day. The interviews were video recorded and both were played for the jury.[14] Combined, both interviews totaled approximately two hours.[15]

During the first interview, detective Fahoum suggested defendant shot in self-defense, which she explained at trial she did to elicit a statement or confession from him despite not having any such evidence. Fahoum also told defendant he faced the death penalty five times in the first hour and 14 minutes of the approximate 90-minute interview. She explained at trial she was not getting any truthful statements from defendant and she wanted him to realize the seriousness of the situation. Fahoum testified she forgot defendant was 17 years old and "it was probably a poor choice of words on my part." Fahoum agreed defendant was ineligible for the death penalty as a minor and she testified she did not use that as a threat, but to "scare him" so he would realize "this was a serious thing." Fahoum did not see defendant react to her references to the death penalty. Defendant did start to cry when Fahoum mentioned he would not see his family again.

Fahoum also used "a bluff" and told defendant five witnesses saw him at the crime scene when police only had Robinson's identification at that time. She also told defendant a forensic analysis of his cellular phone had been done, which was not true at that time, in order to elicit a truthful statement from him or have him explain what happened on the night of the shooting.

In addition, Fahoum told defendant video surveillance at a nearby store showed him shooting, which was not accurate because, although a video existed, it was of poor

---

[14]    By stipulation, the interview transcripts were used in lieu of the reporter's transcript.

[15]    A detailed description of both interviews appears in part I.A., *post*.

9.

quality and no positive identification was possible. Finally, Fahoum told defendant DNA and fingerprints would link him to the crime although no such evidence existed.

Throughout the entire first interview, defendant maintained his innocence and denied any involvement in the shooting.

Approximately 20 or 30 minutes after the conclusion of the first interview, defendant asked to speak with officer Ford of the gang unit. Defendant had previous contact with Ford and he indicated he would feel more comfortable speaking with him. Ford and defendant had met approximately "20-plus" times in the prior two or three years. Ford interviewed defendant that same day at around 6:00 or 7:00 p.m.

During the second interview, Ford continued the self-defense tactic started by Fahoum in hopes defendant would give a truthful statement. Defendant eventually told Ford he shot and it was done in self-defense. After Ford left, defendant retracted his statement with another officer and again denied any involvement in the shooting.

## *DISCUSSION*

### I. *Defendant's trial counsel did not render ineffective assistance*

Defendant contends his pretrial statements to police were involuntary because Fahoum made repeated threats he would receive the death penalty, coupled with a series of deceptions and repeated assertions he was lying. Acknowledging his trial counsel did not seek exclusion of his statements, defendant asserts his trial attorney was constitutionally ineffective for not objecting and maintains there was "no conceivable tactical benefit" for not challenging his statements. He argues the admission of his statements was prejudicial, requiring reversal of his convictions.

To prevail on an ineffective-assistance-of-counsel claim, defendant must show his trial counsel's performance was deficient and the deficiency caused him prejudice. (*People v. Cowan* (2010) 50 Cal.4th 401, 493, fn. 31.) An attorney's failure to seek exclusion of admissible evidence does not amount to ineffective assistance. (*People v. Berry* (1990) 224 Cal.App.3d 162, 170 [where evidence was admissible, "any motion to

10.

have it suppressed would have been futile"; "[t]herefore, counsel was not ineffective when he failed to make the motion"].) Accordingly, to assess defendant's claim of ineffective assistance of counsel, we first consider whether defendant's pretrial statements to police were inadmissible because of coercion.

### A. Factual background of defendant's interviews

Defendant's first interview was conducted by detectives Fahoum and Nelson. At the beginning, Fahoum read defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and he never invoked his *Miranda* rights.

### 1. First interview

Defendant stated he was 17 years old. He denied being involved with the Oriental Troops and asserted he was at his aunt and uncle's house on the night of the shooting. Fahoum said police knew he was involved because "several witnesses" picked his photo in a photo lineup, but she believed it was self-defense and, if that was true, defendant should tell her. Defendant denied being involved.

Fahoum said three people were shot, one victim was in critical condition, and "[i]f he dies, it's murder. Life in prison. With three people dead it could be the death penalty." Defendant continued to deny being involved in the shooting and again stated he was at his aunt and uncle's residence in Orosi when the shooting occurred.

Fahoum asked him why people would have identified him if he was not involved in the shooting, and asked if there was a chance he was in Visalia that night. Defendant continued to state he was at his aunt and uncle's residence that night. She asked him if he realized he was going to be booked for attempted murder in juvenile hall because he was identified on Northeast 4th Street and, if the victim died, it would be murder. She said it was important he tell her what happened in case he was there but was not the shooter and she said his story about being in Orosi was not true because officers saw him in Visalia over the past week. Defendant continued to state he was not around that week.

11.

Fahoum told defendant the judge would believe the five witnesses because defendant had a very distinct look due to his hair, thin stature and height. Defendant changed his story slightly and said he was in Visalia "Sunday or Monday" to stop at a store and he saw Northerners who threw gang signs at him and "they probably" saw his face.

Fahoum said defendant's cell phone had been forensically searched and messages were discovered from people warning him to flee from police. She said his phone began to ring "like crazy" around the same time police "hit" another gang member's house. Defendant said he did not know anything about that and continued to deny being involved in the shooting, stating he was in Orosi that night.

Fahoum stated a local store had video surveillance equipped with night vision and defendant stood right under the camera when the shooting occurred. Defendant indicated he did not understand and Fahoum responded, "You're willing to go ride a death penalty case, life in prison or— [¶] … [¶] —penalty of death rather than tell me what these people did to you before you had to act?" He continued to deny being at the shooting and said he was in Orosi with his aunt and uncle. She said police would interview his aunt and uncle and, if they said defendant was not there, he would spend the rest of his life in jail. He continued to deny any involvement.

Fahoum stated defendant would be booked into juvenile hall because the five "normal people" identified him and she said, "Do you know … what's gonna happen to you? This—today was your last day ever— [¶] … [¶] —to see your family … outside of the jail." At that comment, defendant expressed disbelief, asked "for what?" and bowed his head, placing his face into his hands. She told him "unless these people shot at you first. That changes everything." Defendant looked up, said he was not present at the shooting, and bowed his head back into his hands. When defendant looked up again he appeared to be crying.

Defendant asked to see some evidence linking him to the shooting so she showed him the picture Robinson viewed to identify him and said there was a witness. Fahoum asked if he left his aunt and uncle's house to hang out with his friends, which is how people saw him in the area of the shooting. Defendant changed his story again and said he went fishing on Tuesday or Wednesday, and then went to his grandma's house and from there to Orosi. She asked if that happened Tuesday night and whether that could explain why people saw him. Defendant said, "Yeah." She asked if he hid in people's yards and ducked down because somebody was shooting at him, and defendant continued to deny being involved in the shooting. She told him to stop lying, and after defendant denied lying, she pointed out his story had changed about whether he was in Orosi or not.

Fahoum commented it made sense he was shot at because people saw him hiding and "if somebody's shooting at you, somebody's shooting at you, how can you be in trouble for that?" Defendant responded, "Um, no, you can't get in trouble." Fahoum replied, "You can't get in trouble for being a victim, right?" Defendant denied hiding.

Fahoum left the interview room and defendant put his face into his hands for approximately six seconds before asking Nelson if Fahoum would "really help me out?" Nelson told defendant he should tell the truth and if someone was shooting at him it would be better to say that. Defendant said he did not know the shooter's identity, but police were going to "make me spend the rest of my life in prison." Nelson said they had enough evidence against defendant, but they wanted to give him a chance to explain what happened in case there was an earlier fight or defendant was shot at first. Defendant continued to deny being at the scene of the shooting.

Fahoum returned to the interview room and said she did not believe defendant because an officer visited his aunt's house in Orosi and he had not been there when the

13.

shooting occurred.[16]  Defendant stated his aunt and uncle are afraid of police and Fahoum responded, "Well, they should be more scared that you're gonna get the death penalty.  Right?"  She told him this was his final opportunity to say if someone shot at him first and, if so, she would put that in her report and tell the judge he was running from the area because someone shot at him and not because he shot somebody.

Fahoum asked if he understood "DNA" and stated police would compare his DNA with the DNA on the shotgun casing and also find his fingerprints.  Defendant said he was "not worried" because "I wasn't around there."  He said the people who identified him were probably the same ones who threw signs at him on Sunday or Monday when he was passing by the store and she said the people who picked him were not gang members.  Defendant responded they could have seen him outside his grandma's house and she countered the witnesses said he was hiding.  She told defendant the SWAT team hit his grandma's house and, "if you think I'm kidding, I swear to god I'm not.  I don't lie.  I go to church, I—everything.  I don't lie.  I don't—I don't know how to lie.  So I'm not lying to you.  Okay?  I mean, … I'm a very honest person.  I'm not lying to you.  The SWAT team just hit your grandma's house."

Fahoum told defendant nobody had any doubts he was the one hiding when the police were responding to the shooting scene and "[t]here'll be no doubt in the judge's mind when he sentences you to probably life.  If this guy dies, it's three people shot, one dead, that's the death penalty."

Defendant continued to maintain he was not involved and he was telling the truth.  The first interview ended.

---

**16**     At trial, defendant's uncle testified defendant did not spend the night at his residence during the week of the shooting but did visit during the day.

## 2. *Second interview*

Ford interviewed defendant that same day at around 6:00 or 7:00 p.m. Ford read defendant his *Miranda* rights and defendant said he understood them. Defendant asked Ford what was happening, and Ford said defendant was identified as the shooter and wanted to know defendant's side of what happened. Ford asked if defendant was provoked before running with the shotgun, which he said police were locating over "at Elijah's pad." Ford commented the shotgun would have defendant's fingerprints on it. Ford said, "But what I wanna know is, is this a 17-year-old that … was defending his life? Tell me that. Please tell me that you were just trying to defend yourself." Defendant said, "Yeah." Ford began to get emotional and asked defendant to tell him what happened because they had known each other for a long time. Defendant asked, "If I said no what would happen? If I said yes what would happen?"

Ford said he would know defendant was lying if he said "no" and he would go to jail if he said "yeah" unless he was defending himself. Defendant asked, "That's life, huh? [¶] … [¶] What happened, that's life, huh?" Ford said, "Huh?" and defendant said, "What happened at the incident, whatever everybody was telling me, that's life in prison, huh?" Ford asked if defendant was defending himself, which "is a legitimate thing." Defendant answered, "Yeah." Ford asked if "the guy" pulled a gun on defendant or shot at him, and defendant said, "Yeah. Something like that, yeah." The following exchange occurred:

"FORD:             Okay. So he shot at you[?]

"[DEFENDANT]:   Yeah.

"FORD:             Or did—was he getting ready to?

"[DEFENDANT]:   Yeah. (Inaudible). He—he did shoot.

"FORD:             He did shoot?

"[DEFENDANT]:   Yeah.

15.

"FORD:                    So you were trying to save your life[?]

"[DEFENDANT]:    Yeah.  I just ran behind the bushes but I don't know—I don't know who's the shooter or nothing like that.

"FORD:                    Okay.  How many times did you shoot at him?

"[DEFENDANT]:    I didn't shoot.

"FORD:                    Okay.  You're lying to me now.

"[DEFENDANT]:    I didn't shoot."

Ford said defendant was lying because a witness saw him running with a Mossberg shotgun.  Ford told him to tell the truth and emphasized he could not promise defendant anything, and asked again if it was self-defense, and defendant answered, "Yeah."  Ford asked how many times defendant shot and defendant said he could not remember, but some guys started yelling and they shot at him so he shot back.  Ford asked if defendant had the gun for protection and he answered, "Yeah.  Then I was walking then—then some of the guys started yelling something.  They shot at me."

Ford left the interview room.  Another officer came in to watch defendant, who began to banter with the officer, smiling and joking.  Defendant retracted his statement he fired in self-defense, saying he did not know who did the shooting and "I just said it was me but I don't wanna go down for something I didn't do."  Defendant told the officer, "They said they're gonna put—give me life and I don't know.  [¶] … [¶]  … I wasn't even involved in it."  Defendant again stated he was not at the scene of the shooting and police had the "wrong guy."

## B.    *Standard of review*

"Any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible pursuant to the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution."  (*People v. Dykes* (2009) 46 Cal.4th 731, 752.)  To determine whether a confession is voluntary, courts examine "'"whether a defendant's will was overborne"'" by examining all of the

16.

circumstances surrounding the confession.  (*Ibid.*)  "In making this determination, courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant."  (*Ibid.*; *People v. Haley* (2004) 34 Cal.4th 283, 298.)  Among the factors to examine are ""'"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."'  [Citation.]"  (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

"'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.'"  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176, quoting *People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).)  "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."  (*People v. Linton, supra,* at p. 1177, citing *People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

""'"Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits.  Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.…  Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession.…"  [Citation]'  [Citation.]"  (*Carrington, supra,* 47 Cal.4th 145, 170, quoting *People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

""'"A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.  [Citation.]  Although coercive police activity is a necessary predicate to establish an

17.

involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. [Citation.]" (*People v. Linton, supra,* 56 Cal.4th at p. 1176.)

### C.    Analysis

#### 1.    References to the death penalty and self-defense

A minor is not eligible for the death penalty in California.[17] (§190.5, subd. (a) [death penalty may not be imposed upon any person who was under the age of 18 years when the crime was committed].) Thus, it was not correct for Fahoum to reference the death penalty in her interview of defendant. However, mentioning the death penalty does not, by itself, invalidate a confession. (*People v. Williams* (2010) 49 Cal.4th 405, 443 (*Williams*); *Holloway, supra,* 33 Cal.4th at p. 116; *People v. Ray* (1996) 13 Cal.4th 313, 340.) Instead, a constitutional violation occurs in this context "'only where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises.' [Citations.]" (*Williams*, *supra*, at p. 443; accord, *Holloway, supra,* at p. 116.) Likewise, use of deceptive comments by law enforcement does not, by itself, render subsequent statements involuntary. (*Williams, supra,* at p. 443.)

*Williams* is instructive regarding law enforcement's references to the death penalty and use of deceptive comments. In *Williams*, the police interrogated the defendant four separate times about his involvement in the kidnapping, robbery and murder of the

---

**17**    A trial court has discretion to sentence a juvenile between the ages of 16 and 17 years to life without the possibility of parole for first degree murder. (§ 190.5, subd. (b); *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1369.)

victim, and police referenced or mentioned the death penalty approximately six times during the first interview. (*Williams*, *supra*, 49 Cal.4th at pp. 437-438.) Police told the defendant he was involved in the killing and he was going to prison or would "'*fry in the gas chamber*.'" (*Id.* at p. 437.) The defendant offered various exculpatory remarks and the officers explained they had additional evidence but wanted to hear defendant's account. Police told defendant they were confident he was involved in the murder but suggested he lacked the intent to kill. (*Ibid.*) Officers advised the defendant to tell the truth because the officers would "take their evidence to court and [the] defendant would be found guilty." (*Ibid.*) The defendant was told the only thing that would save him from spending "'*life in prison … or the gas chamber*'" was to tell the truth and if defendant admitted he was wrong the judge and jury would not be so hard on him. (*Id.* at pp. 437-438.) The officers again mentioned the death penalty. (*Id.* at p. 438.)

When the defendant denied killing anyone, the officers repeated they knew he did not intend to kill the victim, and alluded to additional evidence that put the defendant at the crime scene, including fingerprint evidence that did not exist. (*Williams*, *supra*, 49 Cal.4th at p. 438.) The defendant maintained the police had no evidence against him, and he was told this was his "'chance'" before it went "'farther outside of this room'" to the district attorney, judge or jury, and the defendant should tell the truth because the judge and jury look for remorsefulness. (*Ibid.*) The defendant stated, "'*Kill me*'" and one of the officers added: "'*give him the gas chamber*.'" (*Ibid.*) The defendant said, "'[They're] *gonna have to kill me*'" and the same officer responded: "'*They will*.'" (*Ibid.*) The defendant was asked if he wanted to die, he denied he did, and the officers told him to tell the truth. The defendant denied killing the victim.

The officers lied and said three people saw him with the victim at an automated teller machine (ATM), and such evidence was going to send him "'*to the gas chamber*.'" (*Williams*, *supra*, 49 Cal.4th at p. 438.) The defendant replied he did not know what they were talking about and the officers said these people would identify him. (*Id.* at

19.

pp. 438-439.) The defendant responded: "'If they can identify me now they gonna have to.'" (*Id.* at p. 439.) The officers put the defendant back into his cell and advised him to think about remorsefulness and telling the truth. (*Ibid.*) Police interviewed the defendant three more times over the next three days, and the defendant eventually admitted kidnapping the victim, robbing her and witnessing her death at the hand of an accomplice, but not directly causing it. (*Id.* at pp. 419, 439-441.) At the hearing to determine the admissibility of the defendant's statements, one of the officers testified the defendant did not react emotionally to the officers' references to the death penalty in the first interview. (*Id.* at p. 439.)

The *Williams* court determined that neither the officers' reference to the death penalty nor their deception in the first interview overcame the defendant's will. (*Williams*, *supra*, 49 Cal.4th at p. 443.) The Supreme Court noted the defendant exhibited "no sign of distress in response to references to the death penalty, and remained able to parry the officers' questions." (*Ibid.*) The *Williams* court also noted the defendant had experience with the criminal justice system based on past convictions of rape and burglary, and having served a prison term. (*Ibid.*) *Williams* held the deception used by the officers was not likely to produce unreliable self-incrimination. (*Ibid.*) Further, the Supreme Court noted the defendant did not incriminate himself as a result of the officers' remarks but continued to deny responsibility in the face of their assertions. (*Id.* at p. 444.) The *Williams* court was not persuaded that the officers' "vigorous interrogation, display of confidence in defendant's guilt, or use of more sympathetic and less sympathetic interrogators rendered involuntary any statement made by [the] defendant." (*Ibid.*) The *Williams* court noted it was evident the defendant's will was not overborne by the police activity in the first interview because he continued to deny any involvement in the crime and did not make any incriminating statements until he later believed the police had incriminating evidence. (*Id.* at pp. 444-445.)

Here, although we disagree with Fahoum's strategy to suggest this was a death penalty case or to imply defendant was eligible for the death penalty, Fahoum did not threaten a "'vulnerable or frightened suspect'" and then promise or imply prosecutorial leniency in exchange for his cooperation. (*Williams*, *supra*, 49 Cal.4th at p. 443.) Further, as in *Williams*, defendant remained adamant throughout the first interview he had no involvement in the shooting despite the references to the death penalty. Defendant never asked about the death penalty or mentioned it during either of the two interviews. Despite asking to speak with Ford, with whom he had a history and appeared to trust, defendant never sought clarification of the death penalty. As in *Williams*, defendant exhibited little distress in response to Fahoum's references to the death penalty, and remained able to parry the detectives' questions. (*Ibid*.) References to the death penalty did not overbear defendant's will. Indeed, defendant never gave un unequivocal confession.

Defendant, however, argues the death penalty was on his mind as evidenced when he asked Ford about the consequences if he said "no" versus "yes" and Ford said defendant would go to jail if he said yes, at which point defendant commented, "That's life, huh?" and when Ford did not directly respond defendant asked again, "What happened, that's life, huh?" Ford asked, "Huh?" and defendant asked, "What happened at the incident, whatever everybody was telling me, that's life in prison, huh?" Defendant contends this exchange shows "he was looking for a reason to conclude that he would not be sentenced to death for the case." He further asserts this showed his concern with exposure to the death penalty and not an understanding he could only receive a life term, especially since Ford gave no clarifying response.

Defendant's own actions, however, contradict his claim of coercion or intimidation. Defendant became emotional and appeared to cry in the first interview when told he would never see his family again outside of jail. Defendant, however, also smiled and laughed at times throughout both interviews. In the second interview, after

21.

defendant agreed someone shot at him, he continued to deny shooting back, which is not the behavior of one whose free will was overborne. After Ford left the interview room, defendant appeared in very good spirits, laughing and bantering with the officer who remained behind. Defendant's continued denials in the second interview, and his overall demeanor, showed he still possessed the ability to calculate his self-interest in choosing to disclose or withhold information. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.) The facts do not support defendant's assertion Fahoum's references to the death penalty in the first interview was "a close temporal link" that overbore his will, rendering his statements involuntary in the second interview.

Defendant also contends Fahoum used a "conjoined threat and promise" to induce his statements to Ford when she first stated he was eligible for the death penalty but then represented she would tell the judge defendant acted in self-defense. Defendant asserts Fahoum told him he would be exonerated or receive leniency from the court if he admitted acting in self-defense. Defendant's argument, however, is neither supported by the facts nor the law.

It is not coercive for law enforcement officers to discuss whether a suspect acted in self-defense. (*Carrington, supra,* 47 Cal.4th at p. 171; see *Holloway, supra,* 33 Cal.4th at p. 116.) It is also not coercive for law enforcement to suggest a defendant did not intend to kill, to discuss possible explanations for the events that occurred, and to give the suspect an opportunity to provide details of the crime. (*Williams, supra,* 49 Cal.4th at p. 444.)

*Holloway* and *Carrington* are instructive in this regard. In *Holloway*, the defendant was suspected in a double homicide. During the booking process, the detectives explained the crime could result in the death penalty and the truth could not hurt him. (*Holloway*, *supra*, 33 Cal.4th at p. 113.) The defendant continued to deny his involvement, and the detectives persisted, asking the defendant to tell them if he blacked

22.

out or lost his temper.  The defendant inquired what difference it would make and the detective explained it made a lot of difference regarding intent.  (*Ibid*.)

The Supreme Court addressed whether "suggestions that [the] defendant would benefit from giving a truthful, mitigated version of the crimes … constituted implied threats and promises of leniency sufficient to render the subsequent admissions involuntary." (*Holloway*, *supra*, 33 Cal.4th at p. 115.)  In finding the defendant's statements were voluntary, the court explained that suggesting the killing could have resulted from an accident or an uncontrollable fit of rage fell "far short of being promises of lenient treatment in exchange for cooperation."  Rather, the remarks simply indicated that such circumstances could act as mitigation as to the degree of homicide and merely explained a benefit that might naturally flow from a truthful statement.  (*Id.* at p. 116.)

In *Carrington*, the defendant was suspected of a home burglary in Los Altos and a separate homicide in Palo Alto.  A detective from Palo Alto and a police sergeant from Redwood City interviewed the defendant.  The defendant was told that if she cooperated during the interview, the officers "'would try to explain this whole thing with, with Los Altos P.D. as [best] we can.'" (*Carrington*, *supra*, 47 Cal.4th at p. 169.)  Later in the interview, the officers confronted the defendant with incriminating evidence taken from her residence, such as a key to the building where the homicide victim's body was found, the victim's pager, information the defendant's neighbor called the defendant on that pager, and video surveillance footage showing she was present at a convenience store where the victim's ATM card was used.  (*Id.* at pp. 169-170.)  The defendant denied involvement in the homicide.  The defendant was then told that "'what happened out there at [the location of the homicide] was probably an accident'" and there could be mitigating circumstances:  "'What if she scared you?  She confronted you.  Or maybe there was someone else with you.'" (*Id.* at p. 170.)  The defendant was told she should "'purge'" herself because she must be experiencing "'an incredible weight'" on her shoulders.  (*Ibid.*)  Soon after, the defendant confessed to the burglary and to the murder.

The *Carrington* court held the defendant's confession to the murder was not prompted by any express or implied promise of leniency despite the officer's statement he would help the defendant in explaining everything to the Los Altos police. The Supreme Court noted this was not a promise of leniency when considered in the context both of the defendant's prior question as to why she was arrested and the officer's subsequent disclaimer of any control over the burglary investigation. The *Carrington* court also concluded the defendant's confession was not prompted by the officer's comments because she confessed approximately one hour after his comments were made and they confronted her with incriminating evidence linking her to the murder which, the Supreme Court noted, apparently prompted the confession. (*Carrington*, *supra*, 47 Cal.4th at pp. 170-171.) The court dismissed the defendant's claim that "assurances" from the police impermissibly coerced her to confess. (*Id*. at p. 171.) The *Carrington* court held any suggestion the homicide might have been an accident, a self-defensive reaction or the product of fear was permissible as merely "possible explanations of the events and offered [the] defendant an opportunity to provide the details of the crime." (*Ibid.*)

Here, like in *Carrington*, defendant did not make his incriminating statements immediately after Fahoum's alleged threats and promises. Instead, defendant's statements came after Ford reiterated defendant was identified running from the scene with the shotgun, which police were locating "at Elijah's pad."

Further, none of the detectives represented that the police, the prosecutor or the court would grant defendant a particular benefit if he told them how and why the shooting occurred. (*Holloway*, *supra*, 33 Cal.4th at p. 116.) The detectives told defendant the advantages of telling his side of the story, which is permissible. (*Williams*, *supra*, 49 Cal.4th at p. 444.) Although Fahoum said she would tell the judge in her report if defendant acted in self-defense, she neither stated nor implied defendant would be charged with anything less than murder or attempted murder. Ford made it clear he could

not promise defendant anything.  The detectives did not make "[p]romises of exoneration" as defendant argues.  The detectives' discussion of self-defense was permissible and does not render defendant's statements inadmissible.  (*Carrington*, *supra*, 47 Cal.4th at p. 171; see *Holloway*, *supra*, at p. 116.)

Defendant's reliance on *People v. McClary* (1977) 20 Cal.3d 218 (*McClary*) and *People v. Cahill* (1994) 22 Cal.App.4th 296 (*Cahill*) is misplaced.  In *McClary*, the Supreme Court reversed a first degree murder conviction based upon admission of incriminating statements made by the 16-year-old defendant in the second of two police interviews.  The police arrested the defendant and her companion, Sonny, for the murder of an elderly woman.  In the first interview, which was suppressed at trial, the defendant denied she or Sonny had murdered the woman although she admitted they had stayed with the victim for a few days.  (*McClary*, *supra*, at pp. 222-223.)  After being advised of her *Miranda* rights, she mentioned wanting an attorney four times, but the officers ignored her requests and continued interrogating her.  (*Id.* at pp. 223-224.)  The police indicated they had sufficient evidence to prosecute her for murder; they could prove she was lying; she could be prosecuted as a principal or accessory after the fact depending on her knowledge and involvement; and unless she changed her story and confessed to her true involvement, she would be prosecuted for murder.  (*Ibid.*)  In particular, one of the officers told her:  "'You can tell us the truth.  You're [*sic*] involvement can be less than what we think it is right now.  It might be more.  I don't know.  You're the one that's going to have to say.  You can either be a direct participant, or you can be an accessory after the fact.  I don't know which one.  You're the one that knows.  What we're going to try you for unless your story turns out to be true and we can prove your part of the story true, you're going to be tried as a principal, as the person who committed the murder.  Do you understand that? *Unless your story changes to where you can say something else happened* and we can prove you true, then you're going to be tried the other way.'" (*Ibid.*)  In addition, the police falsely told the defendant she would face the death penalty

if charged with murder. (*Id.* at pp. 223, 229.) The first interview lasted almost three hours. (*Id.* at pp. 222, 224.)

The defendant remained in police custody following the first interview. (*McClary*, *supra*, 20 Cal.3d at p. 224.) The police searched her apartment and brought her with them as they conducted the search. (*Ibid.*) In the officers' car following the search, defendant said she "'wished to tell the truth.'" She was informed that, because she had requested an attorney before, the officers could not discuss the matter with her unless she initiated the conversation. (*Ibid.*) The defendant replied she wanted to discuss the case in the absence of an attorney and she was interviewed again. (*Ibid.*) She gave police details of the crime, stating she and Sonny killed the victim after the victim tried to stab them. (*Id.* at p. 225.) At the conclusion of the interview, the defendant agreed to give a filmed reenactment of the crime, which occurred the next day. (*Ibid.*) The defendant's statements and actions during the filming were substantially similar to her statements in the second interview. (*Ibid.*)

The Supreme Court found the statements in the second interview involuntary, finding the following facts significant: "[The d]efendant, while doubtless sophisticated for her years, was a 16-year-old girl; the officers failed to respond to any of [the] defendant's repeated requests for the assistance of counsel; there was a relatively short time span between the two interviews during some of which time [the] defendant had remained in the officers' presence; during the first interview [the] defendant had several times been called a liar; the death penalty had been improperly mentioned; there were implications for leniency in the 'principal vs. accessory' conversation. Taken together, we think it fair to conclude from the record that the threats of punishment and the promises of leniency echoed in the continuum between the two conversations to a degree which renders her statements in the second interview involuntary and inadmissible." (*McClary*, *supra*, 20 Cal.3d at p. 229.) The *McClary* court also noted "the officers

26.

strongly implied that if [the] defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact." (*Ibid.*)

Here, unlike in *McClary*, defendant never invoked his *Miranda* rights, never asked for a lawyer, and never tried to terminate the interviews. Defendant was willing to talk during the first interview and only altered his story as detectives questioned his alibi about being in Orosi with his aunt and uncle on the night of the shooting. More importantly, unlike in *McClary*, there was no "conjoined threat and promise" to induce defendant's statements to Ford. Defendant, however, argues the "promise" came from Fahoum's "representation that she would inform the judge that [defendant] was not the shooter and was, instead, a victim acting in self-defense." Fahoum's statement, however, did not promise leniency and, instead, gave defendant an opportunity to explain his side of the story, which is permissible. (*Williams, supra,* 49 Cal.4th at p. 444.)

Moreover, Ford did not repeat any "misrepresentations and false promises" in the second interview, which "carried over" from the first interview. To the contrary, Ford wanted to know defendant's side of what happened and said he could not make any promises. Unlike in *McClary*, the officers sought an explanation for defendant's presence at the shooting scene and gave him an opportunity to respond without expressly or impliedly promising to reduce his charges or exposure to criminal liability. *McClary* is distinguishable and does not control.

We are also not persuaded by defendant's reliance on *Cahill*. In *Cahill*, two detectives interrogated defendant, who was a suspect in an investigation of a rape and murder committed during the course of a robbery. (*Cahill*, *supra*, 22 Cal.App.4th at p. 300.) The defendant admitted his role in several robberies, but would only discuss the victim's case in hypothetical terms. (*Id*. at pp. 301-305.) The officers told the defendant their evidence established he was in the victim's house and if he did not disclose any mitigating factors he would be charged with premeditated murder. (*Id.* at pp. 305-306.) The lead interrogator gave the defendant a materially deceptive synopsis of the law of

27.

murder, omitting any reference to the felony murder rule, and also repeatedly suggested the defendant could avoid a first degree murder charge if he admitted the killing was not premeditated. (*Id*. at p. 314.) Eventually, the defendant admitted he participated in an armed robbery of the victim but claimed his friend raped and shot the victim. (*Id*. at p. 308.)

The defendant in *Cahill* was convicted of first degree murder and, on appeal, challenged the voluntariness of his confession, alleging the officers' remarks amounted to an implied promise of leniency. The court agreed, finding that "the basis" of the lead detective's efforts to extract a confession from the defendant was "his representation that [the] defendant could avoid a charge of murder in the first degree if the killing were not premeditated." (*Cahill, supra,* 22 Cal.App.4th at p. 314.) According to the court, the "thrust of [the detective's] argument to [the] defendant was that he should tell what had occurred to dispel the implication that the murder was premeditated" (*ibid*.) and the clear implication of his remarks was that the defendant would be tried for premeditated murder unless he admitted he was in the victim's house and denied that he premeditated the killing. This threat, the court found, was also an implied promise that if the defendant admitted his role in the killing but had not premeditated, he might avoid a conviction for first degree murder. (*Ibid.*) The court found the confession was the product of a "false promise" of leniency. (*Id.* at p. 315.) The *Cahill* court noted that where the "dominant focus" of an interview is an "implied promise of leniency" any subsequent confession must be attributed to the implied promise. (*Id.* at p. 316.)

Here, unlike in *Cahill*, the detectives did not misstate California law regarding the potential charges against defendant or the effect of self-defense, and they did not make any false promises. The detectives never misled defendant about the seriousness of his situation and they never stated or implied any prosecutorial leniency. The suggestion defendant might have acted in self-defense was one possible explanation of the shooting and offered defendant an opportunity to provide details about the crime, which is

permissible. (*Carrington, supra,* 47 Cal.4th at p. 171.) Indeed, Fahoum also asked if defendant was present at the scene but not involved in the shooting or was in Visalia on the night of the shooting as a way to explain why defendant was identified. No "implied promise of leniency" dominated the focus of defendant's interviews. (*Cahill*, *supra*, 22 Cal.App.4th at p. 316.) Despite defendant's arguments, his interviews did not proceed "along the same lines as that in *Cahill*." Fahoum never told defendant he would obtain leniency from the court if he admitted he acted in self-defense and she never stated defendant would be "exonerated" as defendant contends. *Cahill* is distinguishable and does not control.

Viewing the interviews as a whole in all their attendant circumstances, we are persuaded defendant's statements were not coerced by references to the death penalty or the detectives' discussion of self-defense. (*Williams*, *supra*, 49 Cal.4th at p. 443; *Carrington*, *supra*, 47 Cal.4th at p. 171; *Holloway*, *supra*, 33 Cal.4th at p. 116.)

### 2. *Deceptions about the strength of the evidence*

Police may use deceptive tactics, including lies, but a reviewing court will consider the impact of those tactics in determining the voluntariness of an ensuing confession. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240-1241.) However, "there must be a *proximate* causal connection between the deception or subterfuge and the confession." (*Id.* at p. 1240.)

"Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [fabricated evidence of fingerprints on a wallet alone not of type reasonably likely to procure an untrue confession]; *People v. Thompson* (1990) 50 Cal.3d 134, 166-167 [officers repeatedly lied, insisting they had forensic evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [confession found voluntary where a wounded defendant was told, perhaps deceptively, that he might die before reaching the hospital and that he should talk to close the record].)

Here, the other deceptions told by Fahoum were not of a type reasonably likely to procure an untrue statement. (*People v. Farnam, supra,* 28 Cal.4th at p. 182; *People v. Thompson*, *supra*, 50 Cal.3d at p. 167.) While scientific evidence can be persuasive, defendant failed to demonstrate Fahoum's brief reference to DNA or fingerprints was "reasonably likely to procure an untrue statement." (*People v. Farnam*, *supra*, at p. 182.) Indeed, when told about the possibility of defendant's DNA on the shotgun casings, defendant simply said he was "not worried" because "I wasn't around there."

Likewise, when Fahoum falsely told defendant his cell phone had been forensically searched and it contained messages from people telling him to flee the police, defendant simply stated he did not know anything about that and the topic was dropped. Defendant also denied being at the crime scene after both Fahoum and Nelson falsely told him he appeared on video surveillance from a nearby store.

There is no substantive difference in coerciveness between the untrue forensic evidence here and falsified fingerprints and forensic evidence the Supreme Court has found unlikely to prompt a false confession. (*People v. Farnam*, *supra*, 23 Cal.4th at p. 182 [fabricated fingerprints on a wallet]; *People v. Musselwhite*, *supra*, 17 Cal.4th at p. 1241 [fingerprints falsely said to have been lifted from victim's neck]; *People v. Thompson*, *supra*, 50 Cal.3d at p. 167 [lie police had found soil samples, car tracks and rope fibers connecting suspect to murder did not invalidate confession].)

Further, when Fahoum interrogated defendant she knew a witness (Robinson) had identified him at the crime scene holding a weapon and attempting to hide. It is well settled law enforcement may confront a witness with what they know. (*Holloway, supra,* 33 Cal.4th at p. 115.) Fahoum's deception in exaggerating the number of indentifying witnesses, or exaggerating their professions and standing in society, was not reasonably likely to procure untrue statements. In any event, defendant continued to offer resistance in both interviews, which does not demonstrate a will overborne by official coercion, but

30.

suggests an "operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 58.)

We are mindful the law requires "'special care'" when scrutinizing a record to determine whether a juvenile's confession was voluntary. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1166-1167, quoting *Haley v. Ohio* (1948) 332 U.S. 596, 599.) However, the law also requires an approach that looks at the totality of the circumstances, including the length of the interview, its location, as well as the defendant's maturity, education, physical condition and mental health. (*People v. Lessie*, *supra*, at p. 1167; *People v. Massie, supra,* 19 Cal.4th at p. 576.) We note defendant had prior experience dealing with law enforcement as evidenced by the probationary report: six previous misdemeanor convictions over a four-year period involving petty theft, battery, possession of marijuana, and giving false representation of identity to peace officers. We also note the police behaved professionally with defendant, did not verbally browbeat him, conducted themselves courteously, offered him both food and drink, and showed concern for his comfort. The first interview lasted approximately 90 minutes and defendant did not appear in poor health and showed no outward sign of mental strain. Indeed, during both interviews, he occasionally joked and smiled with the officers.

We have reviewed the interview transcripts in detail, and the totality of the circumstances supports the conclusion defendant's pretrial statements to police were admissible. As a consequence, it was not ineffective assistance for defendant's trial counsel to not seek exclusion of defendant's statements to police. (*People v. Berry*, *supra*, 224 Cal.App.3d at p. 170.)

## II. *The trial court neither abused its discretion nor violated defendant's constitutional right to confront witnesses by excluding evidence of pending charges against Robinson and Verdugo*

Defendant argues the trial court abused its discretion under Evidence Code section 780 when it denied him the right to confront Robinson and Verdugo about

31.

pending criminal charges against them.  Defendant further maintains the trial court violated his right to confront those witnesses under the Sixth and Fourteenth Amendments to the United States Constitution.

### A.    *Background*

On July 27, 2012, the prosecutor filed an in limine motion requesting exclusion of evidence of Robinson's "pending felony case" under Welfare and Institutions Code section 14107, subdivision (b)(2).[18]  The prosecutor also sought exclusion of Verdugo's pending cohabitation battery case under section 243, subdivision (e)(1).[19]  The motion indicated Robinson had been offered "a misdemeanor if he repays the amount of overpayment, but this offer was not contingent [on] him testifying in this case."

On August 14, 2012, the trial court heard argument on the motion.  Defendant's trial counsel argued Verdugo's pending cohabitation battery case was probative of "bias, interest, and motive in his potential testimony knowing he has a potential case floating

---

[18]    Welfare and Institutions Code section 14107 provides in relevant part:

"(a)  Any person … who engages in any of the activities identified in subdivision (b) is punishable by imprisonment as set forth in subdivisions (c), (d), and (e), by a fine not exceeding three times the amount of the fraud or improper reimbursement or value of the scheme or artifice, or by both this fine and imprisonment.

"(b)  The following activities are subject to subdivision (a):  [¶] … [¶]

"(2)  A person knowingly submits false information for the purpose of obtaining greater compensation than that to which he or she is legally entitled for furnishing services or merchandise under this chapter or Chapter 8 (commencing with Section 14200).  [¶] … [¶]

"(c)  A violation of subdivision (a) is punishable by imprisonment in a county jail, or in the state prison for two, three, or five years."

[19]    Section 243, subdivision (e)(1), provides in relevant part:  "When a battery is committed against a spouse, a person with whom the defendant is cohabiting, a person who is the parent of the defendant's child, former spouse, fiance, or fiancee, or a person with whom the defendant currently has, or has previously had, a dating or engagement relationship, the battery is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail for a period of not more than one year, or by both that fine and imprisonment."

out there that he would hope that the DA would perhaps offer him some kind of deal or immunity for his testimony.  I understand he enjoys the presumption of innocence and hasn't suffered a conviction, but it may be relevant."

The trial court excluded any reference to Verdugo's pending case stating, "Unless you have some specific evidence that he's been in negotiations with the People for leniency in that case for his testimony in this case, I do not see any reason to permit use of the alleged [section] 243[, subdivision ](e)(1) case in this proceeding.  [¶]  Because, clearly, if there's some evidence that he's been offered some deal in exchange for his testimony, then that would go to some bias or motive to shade his testimony in this case.  But my understanding is that no such offer has been made; is that correct?"  The prosecutor answered, "No.  We've never discussed that with him at all."

Regarding Robinson's pending health care fraud case, defense counsel contended it was "the same thing" and argued the first police officer who interrogated Robinson promised him "witness protection," but Robinson was ineligible for such protection under section 290.[20]  Defense counsel noted "I think he's hoping for somehow the agency, or police agency or the DA's office to get rid of the [section] 290, although I don't think that's possible.  [¶]  … His potential testimony may go to bias, motive, or interest regarding his potential future of registering as a sex offender."  The prosecutor commented "there's nothing we can do about the [section] 290.  We've not said we'd do anything about that."

The trial court stated, "I don't think that the People can offer him anything with respect to the [section] 290 registration.  That is a requirement by state law and the

---

[20]     This is the "Sex Offender Registration Act," which requires designated individuals to register with local law enforcement authorities if they have been convicted of certain Penal Code violations, including section 647.6.  (§ 290, subds. (a), (b) & (c).)  Robinson had a misdemeanor conviction under section 647.6 in 2008.

People are obligated as a matter of law to follow the law. [¶] So I'm going to hold to my [tentative] ruling with respect to … Robinson."

The court issued a written ruling stating as to Verdugo: "No reference shall be made to [Verdugo's pending] case. This case is simply an outstanding allegation. [Verdugo] enjoys a presumption of innocence and has not suffered a conviction." As to Robinson, the ruling stated: "No reference shall be made to the [Welfare and Institutions Code] section 14107[, subdivision ](b)(2) case. This case is simply an outstanding allegation. [Robinson] enjoys a presumption of innocence and has not suffered a conviction." The trial court's ruling, however, allowed reference to Robinson's 2008 misdemeanor conviction for "annoying a child under 18." The court excluded reference to Robinson's requirement to register pursuant to section 290 as "more prejudicial than probative."

### B.     Standard of review

"The trial court is vested with wide discretion in determining the relevance of evidence." (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) The appellate court reviews a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)

"'[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, … to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 538; Evid. Code, § 780, subd. (f) [court or jury may consider in determining credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including the existence or nonexistence of bias, interest, or other motive].) However, the right to confront witnesses is not absolute and limitations exist. (*Taylor v. Illinois* (1988) 484 U.S. 400, 410; *People v. Pearson* (2013) 56 Cal.4th 393, 454.)

The right of cross-examination includes exploration of bias or prejudice, which goes to credibility, veracity or motive. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1054.) The confrontation clause is violated when a criminal defendant is prohibited from otherwise appropriate cross-examination to show the witness's bias and to expose to the jury inferences relating to the witness's reliability. (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Confrontation clause issues occur when the trial court places restrictions that effectively "'emasculate the right of cross-examination itself.'" (*Delaware v. Fensterer* (1985) 474 U.S. 15, 19, quoting *Smith v. Illinois* (1968) 390 U.S. 129, 131.)

However, the right of cross-examination is not absolute and may, in appropriate circumstances, "'bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138-1139; see *People v. Stritzinger* (1983) 34 Cal.3d 505, 515.) The trial court has wide latitude to impose reasonable limitations on cross-examination based on concerns about confusion of the issues, prejudice, harassment, repetitive interview or issues that are only marginally relevant. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 455; *People v. Frye*, *supra*, 18 Cal.4th at p. 946; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *People v. Cooper* (1991) 53 Cal.3d 771, 817.) The trial court may apply the statutory rules of evidence without impermissibly infringing upon a defendant's due process rights. (See *People v. Lucas* (1995) 12 Cal.4th 415, 464; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) Despite the confrontation clause, a trial court may limit cross-examination of an adverse witness on the grounds set forth in Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.)

"The confrontation clause 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citations.]" (*People v. Clair* (1992) 2 Cal.4th 629, 656, fn. 3; see *People v. Cooper*, *supra*, 53 Cal.3d at p. 817.) The trial court's exercise of its

35.

discretion does not violate the Sixth Amendment unless the defendant can establish the excluded cross-examination would have produced "'''"'a significantly different impression'"'''" of that particular witness's credibility. (*People v. Pearson*, *supra*, 56 Cal.4th at pp. 455-456, quoting *People v. Brown*, *supra*, 31 Cal.4th at pp. 545-546.)

The California Supreme Court has noted the problems associated with allowing nonfelony impeachment evidence. "In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296-297, fn. omitted.)

### C.     *Analysis*

As an initial matter, defendant concedes his trial counsel did not assert a Sixth or Fourteenth Amendment right to cross-examine Robinson and Verdugo regarding the pending charges. Indeed, it is difficult to determine under what basis defense counsel argued a right to cross-examine them regarding the pending charges because the record neither shows a written opposition to the prosecutor's in limine motion nor did defense counsel cite any statutory or case authority in support of his oral arguments. Nevertheless, defendant argues the constitutional issue is appealable because an objection on state law grounds preserves a related federal constitutional claim principally relying on *People v. Yeoman* (2003) 31 Cal.4th 93 and *People v. Partida* (2005) 37 Cal.4th 428. Respondent argues defendant waived his constitutional claim by failing to object in the trial court and relies on *People v. Burgener* (2003) 29 Cal.4th 833, 869 and *People v. Alvarez* (1996) 14 Cal.4th 155, 186.

We need not decide whether defendant waived his right to appeal the present constitutional issue or whether his defense counsel stated an objection on state law grounds that preserved a related federal constitutional claim because, even when it is presumed defendant preserved a federal constitutional claim, defendant's arguments are unpersuasive.

It is well established the defense is entitled to elicit evidence a witness is motivated by expectations of leniency or immunity, which is probative of a bias or motive. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 455; *People v. Dyer* (1988) 45 Cal.3d 26, 49-50 (*Dyer*).) However, our Supreme Court in *Dyer* stated that without proof of some agreement that could establish a bias or motive to testify against the defendant, the fact a witness has been charged with an unrelated offense is irrelevant and any error in failing to admit such testimony is harmless. (*Dyer*, *supra*, at p. 50; see *People v. Bento* (1998) 65 Cal.App.4th 179, 194 & fn. 4.) In *Dyer*, the defendant wanted to cross-examine two witnesses about charges against them in matters unrelated to the defendant's trial; the defendant hoped to show their testimony would secure help from the police in the unrelated matters. (*Dyer*, *supra*, at pp. 44-45.) During in camera hearings, the witnesses denied any connection between their testimony and the unrelated charges, and these denials were corroborated by other evidence. (*Id*. at p. 48.) The trial court excluded the proposed cross-examination. (*Id*. at pp. 44-46.) The *Dyer* court held the trial court's rulings did not constitute reversible error, reasoning, inter alia, the trial court had wide discretion to limit cross-examination on the grounds of marginal relevance, which did not impact the defendant's rights of confrontation. (*Id.* at p. 48.) After noting the charges against the two witnesses had been dismissed or reduced before they took the witness stand against the defendant, the court held "[i]n the absence of proof of some agreement which might furnish a bias or motive to testify against [the] defendant, the fact that each witness had been charged with the commission of unrelated offenses was irrelevant." (*Id*. at pp. 49-50.)

Here, there is no evidence either Robinson or Verdugo had an agreement or were in negotiations with the prosecution, which might furnish a bias or motive to testify against defendant. Thus, applying the analysis of *Dyer*, defendant was not deprived of significantly probative impeachment evidence and any error in failing to admit such evidence was harmless.[21] (*Dyer*, *supra*, 45 Cal.3d at pp. 49-50; *People v. Bento*, *supra*, 65 Cal.App.4th at pp. 193-194 & fn. 4.)

Moreover, defendant was otherwise afforded an opportunity to thoroughly cross-examine and impeach both Robinson and Verdugo. The trial court permitted defendant to impeach Robinson on his 2008 misdemeanor conviction for annoying or harassing a child under 18 years of age, and defense counsel confronted Robinson at trial with that prior conviction. Defense counsel also confronted Robinson about his eyesight and need to wear corrective lenses, and why Robinson initially thought the suspect was Hispanic.

Likewise, although Verdugo did not have any prior convictions, defense counsel impeached him about his discrepancies between his testimony at trial versus the preliminary hearing, questioned Verdugo about his receipt of $300 from the Visalia Police Department, questioned Verdugo about his distance from defendant when he saw the shots fired, questioned Verdugo about his involvement in the gang, had Verdugo admit he had shot guns at people, had Verdugo admit he had broken into vehicles, had Verdugo admit he was previously arrested for carrying loaded guns, and questioned Verdugo's testimony regarding how defendant climbed a fence while holding two

---

[21] Defendant attempts to minimize *Dyer* by arguing the charges against the two witnesses at issue there "had been dismissed or reduced *before* they took the witness stand against [the] defendant." (*Dyer*, *supra*, 45 Cal.3d at p. 50.) While it is true a decision is typically authority only for points actually considered and decided therein (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620) and dictum is not binding (*People v. Mendoza* (2000) 23 Cal.4th 896, 915), our Supreme Court dictum should be followed by the Court of Appeal when it is part of the Supreme Court's controlling analysis, as is the case for this point of law in *Dyer*. (*People v. Rios* (2013) 222 Cal.App.4th 542, 563; *Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1168-1169.)

weapons. As such, defendant was not prevented from effectively challenging Robinson's or Verdugo's credibility. (*People v. Hill* (1995) 34 Cal.App.4th 727, 739.) The trial court did not abuse its "wide latitude" under state law to exclude this collateral impeachment evidence, which had limited relevancy to the action. (*People v. Contreras* (2013) 58 Cal.4th 123, 152 [a fact may bear on a witness's credibility and still be collateral to the case].)

Further, presuming defendant preserved a related federal constitutional claim, so long as the excluded evidence would not have produced a """"significantly different impression""""" of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. (*People v. Contreras*, *supra*, 58 Cal.4th at p. 152, quoting *People v. Dement* (2011) 53 Cal.4th 1, 52 [The "'ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'"].) In light of the evidence presented at trial, the excluded evidence of the pending charges would not have produced a """"significantly different impression""""" of either Robinson's or Verdugo's credibility amounting to a violation of the confrontation clause and related constitutional guarantees. (*People v. Contreras*, *supra*, at p. 152.)

Moreover, even if the trial court abused its discretion, the error was harmless. The Supreme Court has held the application of ordinary rules of evidence does not implicate the federal Constitution, and, thus, an appellate court reviews the allegations of error under the "'reasonable probability'" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Harris* (2005) 37 Cal.4th 310, 336; *People v. Marks* (2003) 31 Cal.4th 197, 226–227.) However, violations that implicate a constitutional right to confront under the Sixth Amendment require reversal of the judgment unless the prosecution can show "'beyond a reasonable doubt'" the alleged error was harmless. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)

Here, under either standard, the jury would not have reached a different result had defendant been permitted to pursue his proposed line of cross-examination against Robinson and Verdugo. (*People v. Frye*, *supra*, 18 Cal.4th at p. 946.) This is true even though the prosecutor did not know if his office had made any representations to Verdugo, and the prosecutor could not know whether Verdugo had any "expectations or hopes" that motivated him to testify a particular way, as defendant argues. In light of Verdugo's admission to gang involvement, shooting guns at people and breaking into vehicles, it is beyond a reasonable doubt evidence of a pending misdemeanor charge under section 243, subdivision (e)(1), would not have altered the jury's impression of his testimony. Further, we note the pending criminal charge against Robinson for alleged welfare fraud was not related to section 290 or Robinson's alleged desire to obtain witness protection, the very issue which defendant contends shows Robinson might have had a motive to testify favorably for the prosecution.

Finally, defendant's reliance on *People v. Letner and Tobin* (2010) 50 Cal.4th 99 (*Letner*), *People v. Claxton* (1982) 129 Cal.App.3d 638 (*Claxton*), overruled on other grounds in *People v. Fuentes* (1988) 61 Cal.App.4th 956, 967, footnote 10, *Davis v. Alaska* (1974) 415 U.S. 308 (*Davis*), and *People v. Allen* (1978) 77 Cal.App.3d 924 (*Allen*) is misplaced.

In *Letner*, the Supreme Court rejected a *Brady*[22] claim where the prosecution failed to disclose one of its witnesses had an outstanding warrant for petty theft and, in a second case, had pleaded guilty to misdemeanor theft and writing a bad check. Acknowledging that "[i]n general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony" (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296), *Letner* concluded the defendants "have failed to demonstrate that there is a reasonable probability that had the prosecutor

---

[22]    *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

disclosed to [the] defendants the then pending criminal matters facing [the witness] before the prosecution called her as a witness, the jury would have reached a result more favorable to [the] defendants. Accordingly, [the] defendants have not established that their constitutional rights were violated." (*Letner*, *supra*, 50 Cal.4th at p. 178.) The same result applies here. We conclude the trial court did not abuse its discretion in denying exploration of Robinson's and Verdugo's pending criminal charges. Defendant's reliance on *Letner* is misplaced.

Likewise, in *Claxton* this court agreed the exposure of a witness's motivation is a constitutionally protected right of cross-examination. The *Claxton* court, however, found no prejudicial error where the trial court ruled inadmissible evidence of pending charges and probationary status against two witnesses because the jury had other sufficient evidence establishing the witnesses' incarceration and defense counsel argued in closing that the jury should consider whether the two witnesses had something to gain from their testimony. (*Claxton*, *supra*, 129 Cal.App.3d at pp. 661-662.) Here, the jury had other sufficient evidence to impeach Robinson's and Verdugo's credibility, and defense counsel argued their credibility in light of Robinson's past conviction and Verdugo's gang involvement. *Claxton* does not support defendant's argument he is entitled to reversal of his convictions.

In *Davis*, the defendant was charged with a burglary involving the theft of a safe. (*Davis*, *supra*, 415 U.S. at pp. 309-311.) The key prosecution witness was a juvenile, who testified he saw the defendant near where the abandoned safe was found. (*Id.* at pp. 309-311.) Although the juvenile was on probation for burglary, the trial court barred the defendant from cross-examining him regarding whether his probation had motivated him to make an ill-founded identification of the defendant, either because he hoped to shift suspicion away from himself, or because the police had applied undue pressure to him. (*Id.* at p. 311.) The United States Supreme Court held that the ruling contravened

41.

the defendant's confrontation rights, as it prevented him from raising a significant inference of witness bias. (*Id.* at pp. 316-321.)

Here, unlike in *Davis*, the pending charges against Robinson and Verdugo were not related to defendant's charges, alleviating a concern they might hope to "shift suspicion away from [them]" and onto defendant by giving false testimony. (*Davis*, *supra*, 415 U.S. at p. 311.) Moreover, the juvenile witness in *Davis* had been adjudicated and was on probation for his earlier burglaries, which raised a concern the juvenile witness "acted out of fear or concern of possible jeopardy to his probation." (*Ibid.*) Neither Robinson nor Verdugo were on probation and, thus, in risk of a violation, alleviating a concern they might alter their testimony in hopes of prosecutorial favor. *Davis* is distinguishable and does not support defendant's argument the trial court violated his Sixth Amendment right to confront.

In *Allen*, the defendant was charged with committing robbery in concert with a minor, who was the chief prosecution witness. On cross-examination, the defendant was allowed to show charges were still pending against the minor arising out of that robbery, but was refused permission to cross-examine either the minor or his mother concerning pending charges against the minor for two other recent robberies. That refusal was held to be reversible error because "[the] minor could have reasonably believed his punishment would have been greater for the three charges than for the one," and the defendant "had the right to show that both the minor and his mother were possibly under greater prosecution pressure because of three recent robbery charges than only one." (*Allen*, *supra*, 77 Cal.App.3d at p. 933.)

Here, unlike in *Allen*, neither Verdugo nor Robinson were charged with the same crime as defendant. Further, neither Verdugo nor Robinson had multiple pending charges that defendant could use to show "greater prosecution pressure" on them. (*Allen*, *supra*, 77 Cal.App.3d at p. 933.) The trial court in *Allen* excluded all evidence of other possible crimes, whereas the jury here heard evidence Robinson committed a prior crime and

Verdugo committed prior bad acts. *Allen* is distinguishable and does not warrant a finding defendant was denied an effective right to cross-examine both Robinson and Verdugo.

The trial court did not abuse its discretion under state law or violate defendant's right to cross-examine by excluding the evidence of Robinson's and Verdugo's unrelated pending criminal charges. Defendant's convictions will not be reversed.

### III. *Defendant must be resentenced on all counts*

On count 1, defendant was sentenced to LWOP pursuant to section 190.5, subdivision (b). Three consecutive terms of 25 years to life were also imposed on count 1 pursuant to section 12022.53, subdivision (d). On counts 2 through 6, defendant was sentenced to 15 years to life plus three consecutive terms of 25 years to life for firearm enhancements for each count pursuant to section 12022.53, subdivision (d).

Regarding count 1, defendant contends the term imposed violated the Eighth Amendment of the federal Constitution because the trial court failed to consider the constraints imposed by *Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455], and because the trial court used an "unconstitutional presumption" in favor of LWOP. Regarding counts 2 through 6, defendant maintains the sentences are the "functional equivalent" of LWOP and violate the Eighth Amendment.

Respondent argues defendant's sentence in count 1 should be affirmed because section 190.5, subdivision (b), is constitutional and the trial court did not violate *Miller*. Respondent, however, concedes the sentences on the remaining counts violate the Eighth Amendment under *Caballero, supra,* 55 Cal.4th 262.

#### A. *Background*

Prior to sentencing, defendant objected to the application of section 190.5, subdivision (b), to his case on the ground that, under *Miller* and *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] (*Graham*), a term of LWOP or any consecutive sentences imposed on all counts would constitute cruel and unusual punishment violating

43.

the Eighth Amendment. The prosecutor submitted briefing asserting the trial court's

discretion to impose a term of 25 years to life alleviated the concerns stated in *Miller* and

imposition of LWOP would not violate the Eighth Amendment. At the December 7,

2012, sentencing hearing, the prosecutor argued that, based on the offense and

defendant's history, defendant did not have the ability to change.

Regarding the LWOP sentence, the court stated the following at the sentencing

hearing:

> "Counsel and [defendant], this is a weighty decision that the Court must make. I've considered the entire matter. And having heard the trial in this matter and having reviewed the People's brief, the defense brief, and Probation's recommendation, I am struck by the factors listed beginning at [p]age 7 of the People's brief, the facts relating to the crime.

> "The People recite each of the rules that they believe are applicable in the Court's evaluation of this matter. I've read the rules and their arguments, including citation to the facts of this matter, and I agree with their recitation of the rules and the facts, so I will incorporate those matters into the record as if fully set forth therein.

> "I wish for the record to expressly show that I've read and considered these matters and I adopt them. The facts relating to the crime are at [p]ages 7, 8, and the top of [p]age 9 of the People's brief.

> "I also reviewed at [p]ages 9 and 10 the facts concerning the defendant. Again, the People cite to the applicable rules, and I read their citation to the record and to the facts of this matter, and I do agree with respect to the facts concerning the defendant as recited by the People at [p]ages 9 and 10.

> "Turning to [p]age 10 of the People's brief, the People cite the factors of mitigation. They argue that the factors in mitigation do not apply. They cite to the applicable rules at [p]age 10 and at the top of … [p]age 11. I agree with the People's recitation with respect to factors in mitigation that do not apply.

> "Turning to [p]age 11, the People recite factors of mitigation that do not apply to the defendant, and I have read and considered those matters. Again, they cite to the facts and to the circumstances here, and I agree with the People's recitation.

"Counsel, I review these matters because the Court is aware of … section 190.5[, subdivision ](b), which states, in relevant part, 'The penalty for a defendant found guilty of murder in the first degree in any case in which one or more special circumstances enumerated in section 190.2 or 190.25 has been found to be true under section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confined in the State prison for life without the possibility of parole or, at the discretion of the Court, 25 years to life.'

"The Court, understanding its discretion under this statute and having considered the facts and circumstances here and having heard the trial in this matter, agrees with the People that in this instance it should not follow Probation's recommendation, but rather that the Court should impose the sentencing scheme as suggested by the People at [p]ages 13 and 14 of their brief. So I will impose that as the sentence in this matter."

The prosecutor's sentencing brief noted the following factors concerning defendant: he engaged in a pattern of violent conduct, which indicated a serious danger to society in that he was involved in a prior gang-related incident in high school where he openly attacked the victim; his prior performance on juvenile probation was unsatisfactory as he committed the present charged crimes while serving probation; he did not show any remorse; and he presented an ongoing danger to society as illustrated by his actions when he fired five rounds from a shotgun into a group of people, killing one and injuring two others. The prosecutor also listed eight of the nine enumerated facts in mitigation set forth in the California Rules of Court and noted they did not apply. (Cal. Rules of Court, rule 4.423(a).) The prosecutor's brief cited *Miller* and asserted section 190.5, subdivision (b), allowed the trial court discretion to sentence defendant to LWOP so that *Miller* was satisfied.

## B. *Standard of review for sentencing minors to LWOP*

Section 190.5, subdivision (b), provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time

45.

of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1369.)

Individuals have the right "'not to be subjected to excessive sanctions'" pursuant to the Eighth Amendment of the United States Constitution. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2463].) That right derives from the concept "'"punishment for crime should be graduated and proportioned"'" for the offender and the offense. (*Ibid.*) The Eighth Amendment applies to the states. (*Caballero*, *supra*, 55 Cal.4th at p. 265, fn. 1.) It prohibits the infliction of "cruel *and* unusual" punishment. (U.S. Const., 8th Amend., italics added.) Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel *or* unusual" punishment. (Italics added.) The distinction in wording is "purposeful and substantive rather than merely semantic. [Citations.]" (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085.) As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution. [Citation.]" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.) This, however, does not make an analytical difference. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7.) The issue under either approach is whether the sentence imposed is "'grossly disproportionate'" compared to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 21; *People v. Smithey* (1999) 20 Cal.4th 936, 1016.) Defendant does not contend the provisions should be analyzed separately in this case.

Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment. (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217; *People v. Felix* (2003) 108 Cal.App.4th 994, 1000.)

The *Miller* court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," including those who commit homicides. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].)

46.

However, *Miller* does not hold LWOP sentences can *never* be imposed on juvenile homicide offenders.[23]  Instead, such sentences must be discretionary and may be imposed only if the sentencing court, after considering all the relevant information, determines the case involves one of the "'rare juvenile offender[s] whose crime reflects irreparable corruption.' [Citations.]"  (*Miller*, *supra*, at p. __ [132 S.Ct. at p. 2469].)  *Miller* sets forth a list of factors related to the age of a juvenile offender the trial court must consider before imposing an LWOP sentence, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; whether "the family and home environment that surrounds" the juvenile is "brutal and dysfunctional"; "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; and "the possibility of rehabilitation."  (*Id.* at p. __ [132 S.Ct. at p. 2468].)  These will be referred herein as the *Miller* factors.

Our Supreme Court held in *Gutierrez* that, in order to be constitutional, section 190.5, subdivision (b), must be construed to permit the sentencing judge to impose either LWOP or 25 years to life, in the court's discretion, without any presumption in favor of an LWOP sentence.  (*Gutierrez, supra,* 58 Cal.4th at p. 1360.)  The *Gutierrez* court held "*Miller* requires sentencing courts to undertake a careful individualized inquiry *before* imposing life without parole on juvenile homicide offenders.  [Citation.]"  (*Id*. at p. 1382, italics added, citing *Miller*, *supra*, 567 U.S. at pp. __ [132 S.Ct. at pp. 2468, 2469].)  The *Gutierrez* court reasoned, "it is doubtful that the potential to recall a[n LWOP] sentence based on a future demonstration of rehabilitation can make such a sentence any more valid than when it was imposed."  (*Gutierrez*, *supra*, at pp. 1386-1387.)  Rather, the *Gutierrez* court interpreted *Miller* as

---

[23]    Previously, in *Graham*, *supra*, 560 U.S. 48 [130 S.Ct. 2011], the Supreme Court held that the Eighth Amendment categorically precludes the imposition of an LWOP sentence on a juvenile who commits any crime other than homicide.

requiring that "the sentencing authority must address th[e] risk of error [in a judgment of incorrigibility] by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' [Citations.]" (*Id.* at p. 1387.)

This interpretation is reflected in the Supreme Court's discussion regarding the proper disposition of the two cases involved in *Gutierrez*. The court held that even though the trial courts in those cases "understood [they] had a degree of discretion in sentencing," their sentencing decisions were not made "with awareness of the full scope of discretion conferred by section 190.5[, subdivision ](b) or with the guidance set forth in *Miller* and [*Gutierrez*] for the proper exercise of [their] discretion." (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1390-1391.) Because "the records [did] not 'clearly indicate[]' that [the trial courts] would have imposed the same sentence had they been aware of the full scope of their discretion," the Supreme Court remanded both cases for resentencing. (*Id.* at p. 1391.)

In *Graham* , the United States Supreme Court announced that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Graham*, *supra*, 560 U.S. at p. 82 [130 S.Ct. at p. 2034.) Two years later in *Miller*, the Supreme Court declared, "'[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his [or her] culpability." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467], quoting *Eddings v. Oklahoma* (1982) 455 U.S. 104, 116.)

Following *Graham* and *Miller*, the California Supreme Court held a 110-year-to-life sentence imposed for three counts of attempted murder committed as a minor constituted cruel and unusual punishment. (*Caballero*, *supra*, 55 Cal.4th at p. 265.) As

48.

the *Caballero* court explained, "the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.' (*Graham, supra*, 560 U.S. at p[p. 75, 73] [130 S.Ct. at pp. 2029-2030].) The court observed that a life without parole sentence is particularly harsh for a juvenile offender who 'will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender.' (*Id*. at p. [70] [130 S.Ct. at p. 2028].) *Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society. (*Ibid*.)" (*Caballero, supra*, at p. 266.)

In *Caballero*, the Attorney General argued the 110-year-to-life prison sentence for a minor did not violate the Eighth Amendment even though it was the "functional equivalent of a life without parole term" on grounds no individual component of the defendant's sentence by itself amounted to a life sentence. (*Caballero*, *supra*, 55 Cal.4th at p. 271 (conc. opn. of Werdegar, J.).) Our Supreme Court rejected the contention because "the purported distinction between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive." (*Id*. at pp. 271-272.) Thus, the *Caballero* court reversed the sentence and instructed that "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'" (*Id.* at pp. 268–269, quoting *Graham*, *supra*, 560 U.S. at p. 75 [130 S.Ct. at p. 2030]; see *People v. Mendez* (2010) 188 Cal.App.4th

49.

47, 63, 68 [sentence of 84 years to life for juvenile convicted of carjacking, assault with firearm and seven counts of second degree robbery violated Eighth Amendment and required resentencing].)

### C.    *Defendant must be resentenced on count 1*

In the present case, defendant argues "the trial court agreed with the prosecutor's sentencing analysis which asserted that *Miller* was inapplicable to [defendant's] sentencing and that consideration of the requirements imposed by *Miller* was unnecessary."  Defendant further contends the trial court "failed to address or consider the critical issue raised by *Miller*, i.e., whether[] the difficult task of distinguishing 'transient immaturity' from 'irreparable corruption' could reliably be made at the time of [defendant's] sentencing given the ways 'children are different' from adults and thus have 'diminished culpability' together with 'greater prospects for reform [making them] less deserving of the most severe punishments.  [Citation.]"

Respondent counters that section 190.5, subdivision (b), to the extent there exists a presumption in favor of a sentence of LWOP, does not violate *Miller* because the sentencing court may consider the defendant's age and related characteristics prior to imposing an LWOP sentence.  Respondent further argues remand is unnecessary because the trial court would impose the exact sentence after it found no mitigating factors and multiple factors in aggravation, and expressly adopted the prosecution's recommendation to sentence defendant to LWOP "even in light of the mitigating factors that *Miller* directed courts to consider."

It is true, as respondent notes, the trial judge adopted the prosecution's "recitation of the rules and the facts" from the People's brief and incorporated those matters into the record.  However, the prosecutor's brief, although citing *Miller*, did not mention the *Miller* factors, and, instead, reviewed the factors of aggravation and mitigation set forth in the California Rules of Court, rules 4.421 and 4.423.  The trial court also reviewed the probation report.  The probation report included a discussion of some facts pertinent to

50.

the *Miller* factors. For example, the probation report disclosed defendant's parents have been married for approximately 40 years and reside in Farmersville, California. Defendant reported he maintains regular contact with all of his family members, none of whom have had negative contact with law enforcement. The report also indicated defendant stopped attending school after 10th grade and did not graduate as a result of the present offense.

However, the facts set forth in both the probation report and the prosecutor's brief were not expressly identified as facts that could mitigate against an LWOP sentence as articulated in *Miller*. Further, the probation report and the prosecutor's brief did not address *all* of the potentially applicable *Miller* factors. Moreover, nothing in the record indicates the trial court considered "'ways children are different from adults'" or that it considered whether defendant was "'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct at p.2469].) Thus, the trial court's general statement it read and considered the prosecutor's brief is not sufficient, in and of itself, to establish it conducted the requisite analysis of the *Miller* factors. (*Id.* at p. __ [132 S.Ct. at p. 2468]; *Gutierrez*, *supra*, 58 Cal.4th at p. 1387.)

*Miller* instructed it will be "uncommon" to sentence juveniles to LWOP "because of the great difficulty … of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the *rare* juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], italics added.) After *Miller,* a sentencing court is "require[d] … to take into account how children are different, and how those differences counsel *against* irrevocably sentencing them to a lifetime in prison." (*Ibid.,* italics added, fn. omitted.)

Because the *Miller* factors were never discussed in the prosecution's brief, never addressed in the probation report, and never recited by the trial court, it is not clear

51.

whether or not the trial court would have imposed an LWOP sentence had it analyzed the required *Miller* factors and undertook the analysis set forth in *Miller, Caballero*, and *Gutierrez*. As those cases (particularly *Gutierrez*) make clear, that analysis must occur at the time of sentencing; the possibility defendant may be able to obtain an earlier parole hearing date in the future is not an adequate substitute. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1384-1387.)

As such, this matter is remanded to the trial court so it can undertake its Eighth Amendment obligation under *Miller* not to impose a de facto LWOP sentence under section 190.5, subdivision (b), without taking into account how defendant's differences as a child counsel against irrevocably sentencing him to a lifetime in prison and whether defendant is one of the "'rare juvenile offender[s] whose crime reflects irreparable corruption.' [Citations.]" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) Accordingly, defendant's December 7, 2012, sentence on count 1 is vacated and is remanded for resentencing.

### D.    *Defendant must be resentenced on counts 2 through 6*

Respondent concedes *Caballero* is "not materially distinguishable" from this present case and resentencing on counts 2 through 6 is required. We appreciate and accept respondent's concession as proper. As respondent notes, and we agree, even when 12 of defendant's enhancements under section 12022.53, subdivision (d), are stayed (see part IV., *post*), defendant's remaining sentence is well in excess of 100 years to life on counts 2 through 6, which violates the prohibition on "functional equivalent" LWOP sentences. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269; see *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [15-year-old convicted of murder and five counts of attempted murder sentenced to 100 years remanded for resentencing, in part, in light of *Miller* and *Caballero*].)

Defendant's December 7, 2012, sentences on counts 2 through 6 are vacated and we remand "the case to the trial court with directions to resentence defendant to a term

that does not violate his constitutional rights, that is, a sentence that, although undoubtedly lengthy, provides him with a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' [Citation.]" (*Caballero*, *supra*, 55 Cal.4th at p. 273 (conc. opn. of Werdegar, J.).)

### IV. *Twelve of the unstayed enhancements imposed pursuant to section 12022.53, subdivision (d), must be stayed and the abstract of judgment shall reflect the additional stayed enhancements found true by the jury*

On count 1, the jury convicted defendant of first degree murder (§§ 187, subd. (a)) and found true the special circumstance alleging active participation in a criminal street gang (§ 190.2, subd. (a)(22)). On counts 2 through 6, the jury convicted defendant of attempted murder (§§ 187, subd. (a), 664) and found the offenses were committed willfully, deliberately, and with premeditation (§ 189).

Regarding all counts, the jury separately found the following special allegations true:

(1) Personal and intentional discharge of a firearm causing great bodily injury or death as to Arzate, Joseph Nunez and Duenas (§ 12022.53, subd. (d)) [three times in each count];[24]

(2) Personal and intentional discharge of a firearm (§ 12022.53, subd. (c));

(3) Personal use of a firearm (§ 12022.53, subd. (b)); and

(4) Commission of a crime for the benefit of a criminal street gang (§ 186.22, subd. (b)).

At sentencing, the court imposed consecutive terms of 75 years to life as to each count for the three enhancements found true under section 12022.53, subdivision (d). The court stayed all remaining enhancements.

---

**24** The information alleged this special allegation three times in each count, 1 through 6. The verdict forms tracked the same allegation. It is unclear why this special allegation was alleged more than once in each count.

Defendant argues 12 of the enhancements under section 12022.53, subdivision (d), must be stayed in accordance with section 12022.53, subdivision (f). Respondent agrees. We accept respondent's concession as proper because section 12022.53, subdivision (f),[25] precludes the imposition of more than one enhancement under that section "for each crime." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127.) Accordingly, the trial court was required to impose and then stay 12 of the enhancements under section 12022.53, subdivision (d). (*People v. Gonzalez*, *supra*, at pp. 1127, 1130.) A sentence enhancement that is stayed, while part of the sentence, is not served. (*People v. Meloney* (2003) 30 Cal.4th 1145, 1156.) The abstract of judgment must be amended to reflect 12 stayed section 12022.53, subdivision (d), enhancements.

In addition, defendant asserts the abstract of judgment (on p. 3) reflects the imposition of 12 *additional* stayed enhancements of 25 years to life pursuant to section 12022.53, subdivision (d). Defendant requests the abstract to be further modified to strike those additional 12 enhancements. Respondent concedes and further notes these additional 12 enhancements "should not simply be stricken but rather should be changed to reflect the correct enhancements found true by the jury but omitted in the abstract of judgment." We accept respondent's concession as proper.

In addition to the enhancements discussed above, the jury found true six enhancements under section 12022.53, subdivision (b) (one as to each count) and six enhancements under section 12022.53, subdivision (c) (one as to each count), and the

---

[25] Section 12022.53, subdivision (f), states: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section. An enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9 shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)."

trial court stayed these enhancements at sentencing. However, the abstract of judgment does not reflect the enhancements under section 12022.53, subdivisions (b) or (c). Accordingly, following resentencing, the abstract of judgment shall reflect the 12 stayed enhancements under section 12022.53, subdivision (d), the six stayed enhancements under section 12022.53, subdivision (b), and the six stayed enhancements under section 12022.53, subdivision (c).

Finally, on its own motion, an appellate court with jurisdiction of a case may order correction of clerical errors contained in the abstract of judgment. (*People v. Mitchell*, *supra*, 26 Cal.4th at pp. 186-187.) "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*Id*. at p. 185.)

Regarding counts 2 through 6, defendant was convicted of attempted murder. (§§ 187, subd. (a), 664.) The abstract of judgment, however, contains a scrivener's error showing these convictions under sections "667" and 187, subdivision (a). Thus, we order correction of the abstract of judgment to reflect conviction on counts 2 through 6 under sections 664 and 187, subdivision (a).

## V. *The parole revocation fine need not be decided*

As part of the December 7, 2012, sentencing, the trial court imposed and stayed a parole revocation fine of $10,000 pursuant to section 1202.45. Defendant contends the parole revocation fine must be stricken as unauthorized because he was sentenced to a term of life without possibility of parole on count 1 and the sentences on the remaining counts only provided a "theoretical possibility" of parole. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183-1186.) Respondent argues the parole revocation fine under section 1203.45 was correctly imposed and relies on *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.

However, in light of the vacated sentences and remand for resentencing on all counts, we need not resolve this issue.

## ***DISPOSITION***

The December 7, 2012, sentence is vacated for counts 1 through 6. This matter is remanded for resentencing consistent with *Miller* and *Caballero*.

Following resentencing, the abstract of judgment shall reflect 12 stayed enhancements under section 12022.53, subdivision (d), the six stayed enhancements under section 12022.53, subdivision (b), and the six stayed enhancements under section 12022.53, subdivision (c). The abstract shall also reflect convictions on counts 2 through 6 under sections 664 and 187, subdivision (a).

The judgment is otherwise affirmed.

_____
Kane, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Cornell, J.